Clifton Glenn BASS et al., Appellants,

v.

The STATE of Texas, Appellee.

No. 49937.

Court of Criminal Appeals of Texas.

Sept. 23, 1975.

Walter R. Grimes, Houston, for Bass.

Thomas D. White, Houston, for Coleman.

Charles S. Szekely, Jr., Houston, for Haynes.

Carol S. Vance, Dist. Atty., Joe S. Moss, James C. Brough and George Jacobs, Asst. Dist. Attys., Houston, Jim D. Vollers, State's Atty., and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

These appellants were jointly tried and convicted of the offense of murder with malice, which occurred on February 18, 1972. The jury assessed punishment for appellants Bass and Haynes at life imprisonment and assessed appellant Coleman's punishment at twenty (20) years in the Department of Corrections.

At the outset we are confronted with a common ground of error—that the trial court reversibly erred in admitting into evidence the extrajudicial confessions of the other non-testifying appellants, thereby depriving them of the right of confrontation guaranteed by the Sixth Amendment, United States Constitution. See also Article I, Sec. 10, Texas Constitution. Reliance is had upon Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

Prior to the joint trial the appellants urged severance on the ground that each had made written statements and the State intended to use the same. The motions were denied. After the separate hearing on the voluntariness of the confessions, the severance motions were again reurged and again denied.

Subsequently, when the confessions were offered before the jury, the appellants again strenuously objected, citing Bruton to the trial court. The objections were overruled, and the confession of each appellant was admitted into evidence.

■ It is well established as a general rule that a confession of guilt can only be used against the person giving the confession and is inadmissible against others under the hearsay rule. See Schepps v. State, 432 S.W.2d 926, 940 (Tex.Cr.App.1968); Carey v. State, 455 S.W.2d 217 (Tex.Cr.App. 1970); Evans v. State, 500 S.W.2d 846 (Tex. Cr.App.1973); Hearne v. State, 500 S.W.2d 851 (Tex.Cr.App.1973); Ex parte Smith, 513 S.W.2d 839 (Tex.Cr.App.1974); Lewis v. State, 521 S.W.2d 609 (Tex.Cr.App.1975); McCormick & Ray, Texas Law of Evidence, 2nd ed., Sec. 1219, p. 96; 24 Tex.Jur.2d, Evidence, Sec. 667, p. 272.

■ In Bruton v. United States, supra, the United States Supreme Court, overruling Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957), held that despite instruction to the jury to disregard the implicating statements in determining the co-defendant's guilt or innocence, admission at a joint trial of a defendant's extrajudicial confession implicating a co-defendant violated the co-defendant's right of cross-examination secured by the confrontation clause of the Sixth Amendment. And in Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100 (1968), the Supreme Court held that the Bruton decision was not only applicable to the State proceeding, but that the decision was fully retroactive.

■ While a Bruton error is one of constitutional dimension, we do know that such error can, under some circumstances, be harmless constitutional error. Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). See also Ex parte Smith, supra; Carey v. State, supra.

Despite the court's subsequent instructions to the jury in its charge to consider each confession only against the defendant making the same, we conclude, in light of Bruton, that the court erred in admitting the confessions. We must now determine whether such error was harmless or not as to each appellant.

Mary Simmons, wife of the deceased, Hubert Simmons, testified she and her husband were at a Billups Service Station in Houston on February 18, 1972, where her husband was employed. In the early morning hours, shortly after midnight, she awakened on a cot in a back room when two men began attacking her husband. She identified the two as the appellants Bass and

Haynes. When she got up, Haynes began to beat her with a ladder and broke a chair on her until she fell and played dead. Bass then told Haynes to get a gun out of a drawer, where the husband kept his, and when Haynes brought it to Bass she heard Bass say, "I am going to get him. I want to kill him anyhow." She then heard two shots fired. She had earlier observed her husband's condition and knew he was unconscious. While the record was not clearly developed, it appears the witness Simmons was shot before Bass and Haynes left the station. The witness then made her way to the front of the station and yelled for help, etc. Two officers nearby heard her cries and pursued the two fleeing men. Mary Simmons identified the appellant Bass when he was returned to the scene and identified the pistol shown to her as the weapon taken from the station. It was found on Bass.

Houston Police Officer R. J. Matthias related that on the occasion in question he was across the street from the service station when he heard Mrs. Simmons holler there had been a robbery, etc., and observed Bass and another male running. He immediately apprehended Bass, who stated he had "just robbed the station and shot the attendant . . .." When Matthias returned to the station, he observed a broken chair, an overturned stepladder, a broken 7-Up bottle with blood on it and two bullet shells.

Officer Hensen, who was with Matthias when the witness Simmons hollered, identified appellant Haynes as being close to the door of the station at the time. He pursued Haynes into a wooded area and lost sight of him. Without detailing all the other action, Haynes was apprehended in the area by other police units. Haynes' fingerprints were found on the 7-Up bottle found in the station.

Houston Police Officer Wood arrived in the area after receiving a police broadcast. While there, he observed the appellant Coleman drive into an apartment complex parking lot with his auto lights off. He stopped Coleman, but decided to let Coleman go when he stated he lived in the complex although he did not have a driver's license and appeared to have been drinking intoxicants. Twenty minutes later, the officer saw Coleman driving again and stopped him and arrested him.

All the appellants were taken to the police station, where they gave confessions. These confessions were admitted over objection.

Appellant Bass' confession, omitting the warnings, signature and other formal parts, reads:

"My name is Clifton Glenn Bass and I am a colored male 20 years old and I live on Guest Street. Tonight at about 6:00 P.M. I borrowed my sisters car and this is a Comet, blue in color. The car may have been green as I am not sure. When I borrowed the car two other people that I know as RICKY and HAYNLEY were with me at this time and we started to drive around and we all went to the club on Crane Street and there we drank several beers and shot some pool in the place and then we left and I went to Pickfair Street and there I saw my son who stays there with another woman. When we left there we drove around some more and I was driving and I started to think that my kids had nothing and that I needed some money and I was am not working now and I was broke. The first thing that I thought about was hitting some place and we all drove around looking for some place to hit. We drove by the BILLIPS station on Jensen Drive and I thought that this would be a good place and we drove down the street and I let RICKY drive the car and he let me and Haynley out down the street from the station and we walked back to the station. We both went into the station and I bought a bottle of soft drink and then I hit the man at the station who is the manager and I hit him over the head with the bottle and this knocked him to the floor. At this same time Haynley was in

the back part of the room where a woman was on the bed and when I hit the mna (sic) she started to hollor (sic) and then Haynley hit her over the head with a tire tool. At this time I was getting the money from the cash drawer and Haynley told me that there was a gun in the drawer and I got the gun out of the drawer and the manager was still laying on the floor and Haynley told me not to shoot the man but for some reason I shot him any way. I shot the gun two times as I was not sure that I had hit him with the first shot. Then both men and HAYNLEY left the station and run to the right on Jenson drive and then a short way up the street about two blocks the police caught me. I am now in the Homicide office and am giving this statement to Det D. R. SPURLOCK and Det Spurlock explained me (sic) rights to me and I was also given a warning by the officer that arrested me R. J. MATTHIAS. I just was told by Det Spurlock that the man that I know as HAYNLEY is really KELSO HAYNES. I can read the english language and I have read this statement and find that it is true and correct."

Likewise, appellant Haynes' confession reads:

"My name is KELSO HAYNES and I am a colored male 22 years old and I live at the South Park area of town and I don't know the address. Tonight at about 7:30 P.M. me and Clifton and Rickey were together and Clifton borrowed a car from his sister and we started to ride around and drink some beer. We then went to a place on Crane Street and drank some more beer and shot some pool and I got tight and went to the car and went to sleep. I was woke up when the car run into a ditch on SCHILLER street or Curry Street I do not know which one. We could not get the car out of the ditch and Clifton and RICKY went to get some help while they were gone I took the jack and got the car out of the ditch. Then Clifton started to talk about hitting a

place and I tried to talk him out of it, but he called me afraid and we argued and then I told him all right. We rode around a little more and then Ricky let me and Clifton out on Jensen and we walked to the Billups Station and went inside, and then Clifton bought a bottle of coke. Then Clifton hit the attendant with the bottle ane (sic) then I saw Clifton hit the man with a tire tool and then a woman who was on the bed in the back part of the station started to scream and I went to her and pushed her down. I didnnot (sic) hit her and then I looked back to the front and saw Clifton and the man were still tusselling and then the man started to the cash drawer and I knew that he was going for a gun and I told Clifton and Clifton got the gun out of the drawer and I tried to get him to give me the gun, but he would not and then he shot the man two times and then we left the place and started to run to the right after we came out of the place and the Police caught us. I was given a legal warning by the officer that arrested me, officer B. J. CLARK and then before this statement was made Det D. R. SPURLOCK explained my rights to me. I have read the above statement and find that it is true and correct."

And appellant Coleman's confession, extracted in a like manner, reads:

"My name is Freddie Coleman and I live at 4230 Wipprecht with my two brothers, three sisters and my mother and father. I am unemployed right now because I just came from California two or three weeks ago. I used to be a cook at Ritzie Drive Inn on Main Street. Tonight Clifton Bass, who I have known since I was little came by my house with a guy named Kelso. Clifton was driving his sisters car. After they picked me up 'Man, we just hit a place', Clifton Bass said to me. They asked me for my gun but I acted like I didn't have one in the house after going back and looking for it. I told them my brother had it. After we left my house we went to Lockwood

Street and Clifton was driving the car. He was driving and went the first street past the liquor store on Lockwood. This was Spec's Liquor # 2. Clifton Bass got out and told me to scoot over to the drivers seat. Clifton went down to the Liquor store and came back running and got in the car and said take off. I backed the car into the ditch. We put a board under the tires and got out. Clifton said he didn't get anything from the Liquor store but the wallet. After we left there we went riding for awhile. We went down on Jensen Dr. and they told me they were going to rob a Motel. We stopped on Curry Street. Clifton came running back and told me they were almost thru robbing the place. I didn't know it was a service station. Clifton went back and I drove a couple blocks down the street and thats when the Officers got me. I didn't know they had killed a man until the Officers told me. I went to the eleventh grade in school and can read and write the English Language and have read the above statement and it is true and correct."

The cause of the death of Hubert Simmons was shown to be a gunshot wound to the head.

The appellants did not testify at the guilt stage of the trial.[1]

In *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), four defendants were jointly tried for the offense of murder. Harrington admitted being at the scene of the crime, but he denied complicity. One of the other co-defendants who had confessed and implicated Harrington took the witness stand and was cross-examined. The other two co-defendants did not take the stand, but their statements which were introduced corroborated Harrington's presence at the scene of the crime. The court, noting the overwhelming evidence of Harrington's guilt and the relatively insignificant prejudicial impact of these co-defendants' statements, held that any violation of *Bruton* that had occurred was harmless error beyond a reasonable doubt.

Likewise in *Schneble v. Florida,* 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), the court further said:

"The mere finding of a violation of the Bruton rule in the course of the trial, however, does not automatically require reversal of the ensuing criminal conviction. In some cases the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error."

In *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), the court cited *Harrington* and *Schneble* with approval, and stated:

"Upon an independent examination of the record, we agree with the Court of Appeals that the Bruton errors were harmless. The testimony erroneously admitted was merely cumulative of other overwhelming and largely uncontroverted evidence properly before the jury."

In *Carey v. State,* 455 S.W.2d 217, 221 (Tex.Cr.App.1970), this court recognized the rule in *Bruton* was not absolute. See also *Ex parte Smith,* 513 S.W.2d 839 (Tex.Cr. App.1974).

In *Carey v. State, supra,* at p. 221, this court noted:

"It would appear that a substantial difference exists between a joint trial in which a jury hears a co-defendant's statement inculpating a defendant who has himself made similar incriminatory ad-

1. They did testify at the *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 and Article 38.22, Vernon's Ann.C.C.P., hearing and subsequently at the penalty stage of the trial. This testimony was limited to the voluntariness of the confessions at the first hearing, and the judge strictly limited their cross-examination at the penalty stage.

missions, and the Bruton type of case in which the co-defendant's statement is used against a defendant who has made no admissions. In the former situation the prejudice or harmful effect to the defendant, if any, is minimal and entirely insufficient to call for a reversal, particularly where there is other adequate evidence to reflect the defendant's guilt. (authorities cited omitted)"

In *Jones v. State,* 227 So.2d 326 (Fla.App. 1969), it was held that where the defendant's confession, which was clearly admissible as against him, was in such detail that the statements of his co-defendant which implicated him added nothing new the admission was harmless error under *Harrington v. California,* supra. See also *People v. Rosochacki,* 41 Ill.2d 483, 244 N.E.2d 136 (1969).

Likewise, there have been holdings that *Bruton* error is not harmful in joint trials when the confessions of co-defendants essentially corroborate, interlock and support each other. See *United States ex rel. Ortiz v. Fritz,* 476 F.2d 37 (2d Cir. 1973), cert. denied 414 U.S. 1075, 94 S.Ct. 591, 38 L.Ed.2d 482; *United States ex rel. Duff v. Zelker,* 452 F.2d 1009 (2d Cir. 1971), cert. denied 406 U.S. 932, 92 S.Ct. 1807, 32 L.Ed.2d 134; *United States ex rel. Catanzaro v. Mancusi,* 404 F.2d 296 (2d Cir. 1968), cert. denied 397 U.S. 942, 90 S.Ct. 956, 25 L.Ed.2d 123. See also *Stewart v. State,* 519 S.W.2d 733, 737 (Ark.Supr.1975).

■ A review in the instant case of appellants Bass' and Haynes' confessions reflects they are substantially similar in nature, essentially corroborate, interlock and support each other as to the offense charged—the murder of Hubert Simmons. The confessions were merely cumulative of overwhelming independent evidence which showed that Haynes and Bass were acting together during the course of a robbery in which the deceased was beaten and killed, and that they fled from the scene and were apprehended within a short distance therefrom.

We conclude that the probable impact on the minds of the jurors of the admission of Bass' and Haynes' confessions was not so prejudicial so as to require reversal as to them. The State's case as to these two appellants would not have been significantly less persuasive had these two confessions been excluded. We conclude that their admission, while error, was harmless error beyond a reasonable doubt. *Ex parte Smith,* supra; *Carey v. State,* supra; *Schneble v. Florida,* supra; *Harrington v. California,* supra.

■ Now we reach the question of whether the admission, over objection, of appellant Coleman's statement was reversible error as to appellants Bass and Haynes. We conclude such admission was error as to Bass and Haynes. While that part of Coleman's statement which merely placed Bass and Haynes at the scene of the alleged crime was not harmful error, the portion of the statement as to Bass' remark, "Man, we just hit a place" in the presence of Haynes and Coleman's recitation about a subsequent extraneous offense was clearly inadmissible hearsay as to Bass and Haynes. First, there was no basis for the introduction of the extraneous offenses as to these appellants, and the introduction of the statement by a non-testifying co-defendant denied to Bass and Haynes their constitutional right of confrontation and cross-examination. We cannot conclude that this *Bruton* error was harmless error beyond a reasonable doubt.

Next, we must consider whether the introduction of Bass' and Haynes' confessions, over objection, constituted reversible error as to Coleman.

■ Aside from the statements of the appellants, the independent evidence did not connect the appellant Coleman with Bass or Haynes or with the alleged crime. It merely placed him some five or six blocks from the scene of the alleged crime shortly

after the offense.[2] The only reference in the statements to the killing itself is found in Bass' and Haynes' confessions, as Coleman had no personal knowledge of the killing. It was Coleman's theory of the case that he was not a principal. The court submitted the case to the jury on the law of principals and instructed the jurors to acquit Coleman unless they believed beyond a reasonable doubt that Coleman acted together with Bass and Haynes as a principal. The statement in Bass' confession, among others, that " . . . we all drove around. looking for some place to hit" was clearly prejudicial to Coleman and was introduced without Coleman having the benefit of confrontation and cross-examination of Bass. We are unable to conclude that without Bass' confession the State's case (against Coleman) would not have been less persuasive. *Schneble v. Florida,* supra; *Lewis v. State,* 521 S.W.2d 609 (Tex.Cr.App.1975).

Since the judgment against Coleman must be reversed because of the introduction of Bass' confession over objection, we need not consider whether the introduction of Haynes' confession, which was a *Bruton* error, was also reversible error.

Likewise, we need not consider Coleman's contention that the court erred in failing to give a limiting instruction as to the use of evidence of extraneous offenses or other grounds of error.

For the reasons stated, the judgments are reversed and causes remanded.

MORRISON, Judge (concurring in part and dissenting in part).

I concur in the results as to the appellant Coleman. However, I respectfully dissent in the results as to the appellants Bass and Haynes. The admission of appellant Coleman's statement referring to extraneous offenses was error. But, in view of the overwhelming independent evidence of guilt of Bass and Haynes, I cannot conclude that

the probable impact on the minds of the jurors was so prejudicial as to require reversal.

The testimony of the deceased's wife, who was an eye witness to the murder, the physical evidence and the individual confessions of Bass and Haynes were of such strong character as to lead to the conclusion that the State's case would not have been less persuasive had this statement been excluded. Therefore, the admission of this statement, while error, was harmless error beyond a reasonable doubt. *Schneble v. Florida,* supra; *Harrington v. California,* supra.

No reversible error has been shown as to Bass and Haynes. The judgments as to them should be affirmed.

DOUGLAS, J., joins in this opinion.

---

2. While the State traced the registration of the car in which he was arrested to a Robert Smith, there was no showing of any connection or relationship between Smith and Bass.