TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-99-00515-CR






Terrance Marioneaux, Appellant



v.



The State of Texas, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT


NO. 992108, HONORABLE THOMAS BLACKWELL, JUDGE PRESIDING







 A jury convicted Terrance Marioneaux of aggravated assault of a public servant. 
See Tex. Penal Code Ann. § 22.02 (West 1994). The jury assessed punishment at twenty-five
years in prison and a $10,000 fine. Appellant contends on appeal that the district court erred by
instructing the jury to presume that he knew he was assaulting a police officer. He further
contends that the court erred by admitting an ambiguous medical examiner's report without the
proper predicate. We will affirm the judgment.


BACKGROUND


 Austin Police Officer Jeff Domel heard a gunshot while on patrol and drove to
investigate. After he pulled over a pickup in connection with the shot, he was joined by Officer
Jason Greve. Both officers were wearing police uniforms and driving their marked squad cars
with pursuit and strobe lights activated. Though they determined the pickup's occupants had
nothing to do with the shot, Domel arrested and handcuffed one of the passengers based on an
outstanding warrant. The officers then heard a series of gunshots progressing toward them on a
brushy hillside overlooking the arrest scene. Domel, Greve, and the truck passengers took cover. 

 Domel heard a metallic clattering on the other side of his car; when he looked over
the trunk of his car, he saw a man he identified in court as Marioneaux walking past the cars. 
Domel testified that, as Marioneaux walked away, he was working the pump action on a shotgun
("racking" the shotgun). Domel said he heard the shotgun fire and saw a flash from the muzzle. 
Domel testified that the weapon was pointed toward him; on cross-examination, he stated that the
shotgun was pointed in his general direction. Neither the officer, his car, nor the pickup were hit
by shotgun pellets. Greve testified that he heard several shots, but could not say whether any
came from a shotgun and did not know from what direction they came. The pickup's driver
testified that he did not hear a shotgun blast.

 In response to the shotgun firing, Domel shot Marioneaux three times. 
Marioneaux, apparently hit, ran away with the shotgun, leaving a trail of blood. (No shotgun was
recovered, though a shotgun case was recovered from a car from which Marioneaux's fingerprint
was lifted.) Domel and Greve discovered a .45 pistol on the ground in front of the police cars. 
Concerned that there might be more shooters on the hill, they stayed in the area and radioed for
assistance regarding the unknown shooters and with the fleeing suspect.

 Other officers responding to their call arrested a bleeding Marioneaux at his
family's house nearby. A trail of blood from the police car area led to that house. The blood
matched Marioneaux's blood.

 Marioneaux, called as a rebuttal witness, told a different version of events. He said
he had been smoking marijuana (unaware that it was laced with PCP) when he and some
acquaintances began arguing. He eventually fled because he knew the other disputants were
armed. He exchanged gunfire with them at various times during his flight; he had both a .45
pistol and a shotgun. While fleeing, he fell and rolled down a hill, losing his .45 in the process. 
At the bottom of the hill, he saw police cars with lights flashing, but saw no police officers. He
got up and ran down the street, trying to unjam the shotgun. He said that, if he racked the
shotgun, that was when he did so. He denied seeing police officers and denied firing the shotgun
at them or their cars. He then heard more gunshots and felt himself get hit by bullets. He ran
to his house, passed out, then awoke in handcuffs.

 The court charged the jury on three levels of culpability. The jury acquitted
Marioneaux of attempted capital murder, convicted him of aggravated assault of a peace officer,
and therefore did not reach the deadly conduct charge.


DISCUSSION


 By his first point of error, Marioneaux complains that the district court erred by
charging the jury that he was presumed to know that Domel was a peace officer because Domel
was wearing a uniform. The aggravated assault count required a finding that, while Marioneaux
was shooting at Domel, he knew that Domel was a peace officer. See Tex. Penal Code Ann.
§ 22.02(b) (West 1994). The disputed charge instructed the jury (tracking statutory language) that
"[t]he defendant is presumed to have known the person assaulted was a public servant if he was
wearing a distinctive uniform or badge indicating his employment as a public servant." See id.
§ 22.02(c). The court then instructed the jury: 


(A) that the facts giving rise to the presumption must be proven beyond a
reasonable doubt;


(B) that if such facts are proven beyond a reasonable doubt the jury may find that
the element of the offense sought to be presumed exists, but it is not bound to
so find;


(C) that even though the jury may find the existence of such element, the state
must prove beyond a reasonable doubt each of the other elements of the
offense charged; and


(D) if the jury has a reasonable doubt as to the existence of a fact or facts giving
rise to the presumption, the presumption fails and the jury shall not consider
the presumption for any purpose.


See id. § 2.05(2) (West 1994). Marioneaux contends that the instruction allowed the jury to
convict him without requiring the State to prove each element of the offense. He contends the
charge violated his right to due process under the federal constitution. U.S. Const. amends. V
& XIV.

 If the record reveals a constitutional error subject to harmless error review, we
must reverse unless we determine beyond a reasonable doubt that the error did not contribute to
the conviction. Tex. R. App. P. 44.2(a). Erroneous admission of evidence that implicates the
Confrontation Clause is subject to harmless error analysis. See Evans v. State, 534 S.W.2d 707,
710-11 (Tex. Crim. App. 1976); see also Rose v. Clark, 478 U.S. 570, 582 (1986). We must
disregard any non-constitutional error that does not affect substantial rights. Tex. R. App. P.
44.2(b).

 We conclude that the instruction is not erroneous. The instruction tracks the
statutory language and does not violate the constitution. The disputed instruction validly creates
a permissive presumption because it allows--but does not require--the trier of fact to infer an
element of the offense from proof by the prosecutor of an underlying basic fact. See County Court
of Ulster v. Allen, 442 U.S. 140, 156 (1979). In Allen, the Supreme Court wrote:


Because this permissive presumption leaves the trier of fact free to credit or reject
the inference and does not shift the burden of proof, it affects the application of the
"beyond a reasonable doubt" standard only if, under the facts of the case, there is
no rational way the trier could make the connection permitted by the inference. 
For only in that situation is there any risk that an explanation of the permissible
inference to a jury, or its use by a jury, has caused the presumptively rational fact
finder to make an erroneous factual determination.


This instruction expressly leaves the fact finder free to credit or reject the inference and does not
shift the burden of proof. There is no dispute regarding the basic fact that Domel's clothes
identified him as a police officer. The permissive presumption is that an assailant knows that a
victim wearing a police uniform is a police officer. That is an especially rational connection on
the facts here because the uniformed officer was crouched behind a police cruiser with its
overhead lights activated. The court did not err.

 Even if the instruction were erroneous, the instruction was not a factor in the
verdict based on the evidence presented. The conflict in the evidence concerns not whether
Marioneaux could discern that Domel was an officer, but whether Marioneaux saw Domel at all. 
Domel said Marioneaux saw him and fired toward him; Marioneaux denied that he saw anyone
around the police cars and did not recall racking the shotgun, much less firing it at a uniformed
officer. There is no testimony that Marioneaux fired near the police cars thinking he was firing
at someone other than an officer. The jury's decision whether Marioneaux saw the officer is
independent of the presumption that a person assaulting a uniformed officer knows he is assaulting
a peace officer. Because the presumption instruction did not contribute to the verdict, we overrule
point one.

 Marioneaux next contends that the district court erred by permitting the admission
of State's Exhibit 267, a record of his medical treatment following his arrest. The State offered
the record as a business record through the affidavit of the Brackenridge Hospital records
custodian; the doctor who made the report did not testify. See Tex. R. Evid. 803(6). Marioneaux
complains that the vagueness of the record regarding which bullet wounds were entry wounds
takes it outside of the business-record hearsay exception. See id. Marioneaux contends that the
admission of this vague record violated his right to confront witnesses. See U.S. Const. amend.
VI. He contends that the erroneous admission of this evidence may have tipped the balance in the
jury's decision regarding whether he faced, saw, and fired at Domel.

 Admission of hearsay evidence implicates a criminal defendant's Sixth Amendment
Confrontation Clause rights because the admission deprives the defendant of the opportunity to
confront the out-of-court declarant. See Guidry v. State, 9 S.W.3d 133, 149 (Tex. Crim. App.
1999), petition for cert. filed (May 9, 2000) (citing Ohio v. Roberts, 448 U.S. 56, 63 (1980)). 
A hearsay statement nonetheless may be introduced against a defendant if the statement bears
sufficient "indicia of reliability." Guidry, 9 S.W.3d at 149 (citing Roberts, 448 U.S. at 66). A
hearsay statement is per se reliable under the Confrontation Clause if it falls within a "firmly
rooted" exception to the hearsay rule. Guidry, 9 S.W.3d at 149 (citing White v. Illinois, 502 U.S.
346, 356) (1992)). The business records exception to the hearsay rule is a "firmly rooted"
exception. Huff v. State, 897 S.W.2d 829, 843 (Tex. App.--Dallas 1995, pet. ref'd) (citing
Roberts, 448 U.S. at 66 n.8). Accordingly, if a record falls within the business records exception,
no further analysis need occur. Guidry, 9 S.W.3d at 150 n.13 (citing Idaho v. Wright, 497 U.S.
805, 817 (1990)). Even if a hearsay statement does not fall within a "firmly rooted" exception,
it may nonetheless be sufficiently reliable for Confrontation Clause purposes if it has
"particularized guarantees of trustworthiness." Guidry, 9 S.W.3d at 150 (citing both Wright, 497
U.S. at 816, and Roberts, 448 U.S. at 66). The trustworthiness of hearsay evidence must be
evaluated in light of the totality of the circumstances with a court considering "only those
[circumstances] that surround the making of the statement and that render the declarant
particularly worthy of belief." Guidry, 9 S.W.3d at 150 (citing Wright, 497 U.S. at 819). The
trustworthiness requirement is satisfied if cross-examination would be of only "marginal utility;"
there must be "an affirmative reason arising from the circumstances in which the statement was
made" which provides a basis for rebutting the presumption that a hearsay statement is not
reliable. Guidry, 9 S.W.3d at 150 (citing Wright, 497 U.S. at 819). The harmless error doctrine
applies to confrontation clause rights. See McMahon v. State, 582 S.W.2d 786, 793 (Tex. Crim.
App. 1978); see also Garcia v. State, 919 S.W.2d 370, 394 (Tex. Crim. App. 1994) (op. on
reh'g).

 The criticized ambiguity in the report is on the triage note line. The note is
handwritten with interlineations and some overwriting. The note states:


 
 

 R shoulder

 GSW to chest entrance wound, 1 exit R axilla 


 1 R post. shoulder


In the second grouping in the middle line, as shown, a two and one are written in the same space
preceding the word "entrance." It is not entirely clear which number came first and which is
overwritten, but the crossing out of the "s" following "wound" indicates that "entrance wound"
is singular and thus that "one" is the "final" number. In a narrative portion of the report of the
operation, the doctor stated that Marioneaux "suffered several gunshot wounds to the right
shoulder which were through-and-through injuries, and to the left shoulder." There is no
description of the direction of the bullet paths.

 A DNA analyst testified regarding the meaning of the notes. She said GSW was
an abbreviation for gunshot wound. She interpreted the next phrase as meaning "one entrance,
right shoulder." She did not specify whether the entrance was from the front, but the contrast
with the specification on the third line of right "post." (likely meaning posterior or rear) shoulder
indicates that the overline note means the entrance wound was on the front of the shoulder. On
cross-examination, however, she admitted that she could not differentiate entrance and exit
wounds from examining Marioneaux; following that admission, the district court sustained
objections to questions regarding which of Marioneaux's scars resulted from bullet entry on the
grounds that she had stated her inability to answer the question.

 We conclude that the records are sufficiently trustworthy to be admitted as business
records. Under the rule, otherwise admissible business records can be excluded if "the source
of information or the method or circumstance of preparation indicate lack of trustworthiness." 
Tex. R. Evid. 803(6). Marioneaux does not challenge the notating doctor's qualifications or
methods, but instead the nature of the information recorded. He contends that the ambiguity of
the notes makes them subject to interpretation and therefore untrustworthy, citing Cole v. State,
839 S.W.2d 798, 804 (Tex. Crim. App. 1990). The Cole court, however, was primarily
concerned with whether a report from police laboratories could be sufficiently fact-based to avoid
bias favoring the State. See id. at 804-10 (finding bias barred admissibility under Rules 803(6)
and 803(8)). There is no contention of bias favoring the State here because the notating doctor
was not affiliated with the police, was not determining responsibility for the crime, and was
treating Marioneaux's injuries. We conclude that the susceptibility of records to different
interpretations goes to the weight of the evidence rather than its admissibility. Marioneaux
confronted the DNA analyst, the only witness to testify that the records could be read to signify
a frontal entrance wound, and elicited testimony showing her inability to say with certainty what
the notes said or what Marioneaux's body showed regarding the location of entrance wounds.

 We further conclude that the connection between whether Marioneaux was wounded
in front and whether he fired at police is too tenuous for the ambiguity to have contributed to his
conviction or punishment. A frontal entrance wound is not inconsistent with Marioneaux's
version of events; with the police car lights flashing, Domel hiding, and Marioneaux's attention
on unjamming his shotgun, Marioneaux could have faced Domel sufficiently to incur an entrance
wound in the front of his shoulder without seeing or firing at Domel. Marioneaux could also have
faced Domel without firing at him. Nor would only posterior entrance wounds exclude
Marioneaux firing at the police. He could have fired while walking away from police, or fired
and turned before Domel returned fire. Again, this case turns on the jury's choice between the
competing versions of events told by Marioneaux and Domel. We conclude beyond a reasonable
doubt that the ambiguity of the records did not contribute to their decision to convict Marioneaux. 
We overrule point two.


CONCLUSION


 Having overruled both points of error, we affirm the judgment.

 


 


 Jan Patterson, Justice

Before Justices Jones, Yeakel and Patterson

Affirmed

Filed: July 27, 2000

Do Not Publish


 R shoulder

 GSW to chest entrance wound, 1 exit R axilla 


 1 R post. shoulder


In the second grouping in the middle line, as shown, a two and one are written in the same space
preceding the word "entrance." It is not entirely clear which number came first and which is
overwritten, but the crossing out of the "s" following "wound" indicates that "entrance wound"
is singular and thus that "one" is the "final" number. In a narrative portion of the report of t